UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| KIMBERLY MARIE HALMERS,<br><br>　　　　Plaintiff,<br><br>　　　　v.<br><br>CAROLYN W. COLVIN,[1] ACTING COMMISSIONER SOCIAL SECURITY ADMINISTRATION,<br><br>　　　　Defendant. | No. 3:12-cv-00288 (MPS) |

**MEMORANDUM OF DECISION**

**Introduction**

Plaintiff Kimberly Marie Halmers ("Ms. Halmers") brings this action under 42 U.S.C. § 405(g), seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for supplemental security income ("SSI") under the Social Security Act ("SSA"). Before the Court are Ms. Halmers's Motion for Judgment on the Pleadings [doc. #11] and the Commissioner's Motion for an Order Affirming that decision [doc. # 15].

While the Administrative Law Judge ("ALJ") agreed that Ms. Halmers suffers from severe mental impairments arising from her anxiety and depression, there is also substantial evidence in the record to support the Commissioner's determination that Ms. Halmers's claimed impairments are not so limiting as to warrant a finding that Ms. Halmers is disabled as defined in the SSA. It is for the Commissioner – here, the ALJ – and not this Court to make credibility

---

[1] At the time this action was commenced, Michael J. Astrue was Commissioner of Social Security. Commissioner Astrue's term ended on January 19, 2013, and on February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security. Pursuant to Fed. R. Civ. P. 25(d), Carolyn W. Colvin is substituted for Michael J. Astrue as the defendant in this suit.

1

determinations, and the Court finds that those determinations – as well as the Commissioner's other determinations – have been adequately explained and are supported by substantial evidence in the record. For these reasons and those detailed below, the Court GRANTS the Commissioner's Motion for an Order Affirming the Decision of the Commissioner and DENIES Ms. Halmers's Motion for Judgment on the Pleadings.

## Procedural History

Ms. Halmers applied for SSI, alleging disability beginning May 1, 2008. This application was denied initially on February 24, 2010, and upon reconsideration on May 4, 2010. Ms. Halmers requested a hearing, and testified at a hearing held on May 23, 2011, before ALJ Marlene W. Heiser. Ms. Halmers was represented by counsel during the hearing.[2]

On June 24, 2011, the ALJ issued her decision that Ms. Halmers had not been disabled as defined in the SSA since the date the application was filed. Applying the five-step sequential evaluation process prescribed by 20 C.F.R. § 416.920(a),[3] the ALJ first found that Ms. Halmers was not engaged in substantial gainful activity. (R. at 22.) At Step Two, the ALJ found that Ms.

---

[2] Ms. Halmers filed an earlier application for SSI on June 11, 2009, alleging disability beginning May 1, 2008. Her application was denied at the initial level of review on September 1, 2009, and there is no indication that it was appealed further.

[3] The regulations promulgated by the Commissioner establish a five-step analysis for evaluating disability claims. *Bowen v. Yuckert*, 482 U.S. 137, 140–142 (1987); 20 C.F.R. §§ 404.1520, 416.920. First, the Commissioner considers if the claimant is presently working in substantial gainful activity. 20 C.F.R. § 416.920(a)(4)(i). If not, the Commissioner next considers if the claimant has a medically severe impairment. § 416.920(a)(4)(ii). If the severity requirement is met, the third inquiry is whether the impairment is listed in Appendix 1 of the regulations or is equal to a listed impairment. Section 416. 920(a)(4)(iii); Pt. 404, Subpt. P.App. 1. If so, the disability claim is granted. If not, the fourth inquiry is to determine whether, despite the severe impairment, the claimant's residual functional capacity allows him or her to perform any past work. Section 416.920(a)(4)(iv). If a claimant demonstrates that no past work can be performed, it then becomes incumbent upon the Commissioner to come forward with evidence that substantial gainful alternative employment exists that the claimant has the residual functional capacity to perform. Section 416.920(a)(4)(v). If the Commissioner fails to come forward with such evidence, the claimant is entitled to disability benefits. *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990); *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982).

Halmers's anxiety and depression qualified as severe impairments. (R. at 22.) *See* 20 C.F.R. § 416.920(c). The ALJ also found that Ms. Halmers suffered from medically documented, yet non-severe, impairments of diabetes, headaches, and obesity and a medically unsubstantiated claim of hip pain. (R. at 22-23.) *See* 20 C.F.R. §§ 416.909, 416.921. At Step Three, the ALJ found that Ms. Halmers's impairments did not meet or equal one of the impairments in 20 C.F.R. Part 404, Subpart P, App. 1. (R. at 23-24.) *See* 20 C.F.R. §§ 416.920(d), 416.925, 416.926.

Proceeding to Step Four, the ALJ found that Ms. Halmers had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels[4], but with the following nonexertional limitations:[5] "she is limited to simple, routine, repetitive tasks involving short, simple instructions in the environment with few workplace changes, no strict time or production quotas, no public contact, and only brief, infrequent contact with supervisors and co-workers." (R. at 25.) In making this finding, the ALJ considered Ms. Halmers's symptoms according to the two-step process in 20 C.F.R. § 404.1529 and found that:

---

[4] "When the limitations and restrictions imposed by [the claimant's] impairment(s) and related symptoms, such as pain, affect only [the claimant's] ability to meet the strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing, and pulling), [the Social Security Administration] consider[s] that [the claimant] ha[s] only exertional limitations." 20 C.F.R. §§ 404.1569a(b), 416.920a(b). The agency "classifies jobs as sedentary, light, medium, heavy, and very heavy. These terms have the same meaning as they have in the Dictionary of Occupational Titles, published by the Department of Labor." *Id.* §§ 404.1567, 416.967. For example, sedentary work "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties." *Id.* "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. . . . [A] job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." *Id.* If a claimant qualifies for a certain exertional level, then the claimant qualifies for all lower exertional levels. *Id.*

[5] Limitations and restrictions that prevent the claimant from meeting job requirements *other* than strength demands are considered nonexertional. 20 C.F.R. §§ 404.1569a(c), 416.920a(c). Examples include difficulty maintaining attention, understanding or remembering detailed instructions, and tolerating physical features of certain work settings (such as dust or fumes). *Id.*

> [T]he record shows that the claimant was actually able to work from 2003 to 2008. And in 2005 and 2006, her earnings were at the substantial gainful activity level (Exhibit 4D). Since, according to Dr. Gianinni, the claimant's condition was essentially the same then as it is now, the claimant should be able to work in substantial gainful activity now, since her impairment did not prevent substantial gainful activity in the past. . . . Given her ability to work in the past with essentially the same symptoms, it appears the claimant could do at least simple work in a relatively isolated setting, as reflected in the residual functional capacity.

(R. at 27-28.) The ALJ further found that Ms. Halmers could not perform any past relevant work. (R. at 28.)

Therefore, the ALJ proceeded to Step Five, where she credited a vocational expert's testimony that, given Ms. Halmers's age, education, work experience, and RFC, Ms. Halmers could perform the following jobs: (1) hand packer (D.O.T. 529.687-086, with 107,000 jobs in the national economy); (2) production worker (D.O.T. 590.684-026, with 67,000 jobs in the national economy); and (3) production inspector (D.O.T. 529.687-082, with 110,000 jobs in the national economy). (R. at 29.) All of these positions were classified as unskilled, medium exertional level jobs.[6] (R. at 29.) The ALJ concluded that Ms. Halmers is not disabled within the meaning of the SSA. (R. at 30.)

On July 21, 2011, Ms. Halmers filed a timely request for a review of the ALJ's decision with the Social Security Appeals Council ("Appeals Council"). The Appeals Council denied Ms. Halmers's request for review on December 30, 2011, making the ALJ's decision the final decision of the Commissioner. This action followed.

## **Analysis**

Ms. Halmers presents four arguments in her appeal: (1) the ALJ failed to follow the

---

[6] At the hearing before the ALJ, the vocational expert also provided statistics for the national jobs available for each of the three offered jobs at the unskilled, light exertional level and the unskilled, sedentary exertional level. (R. at 62-63.)

"treating physician rule" (Pl. Mem. at 11); (2) the ALJ failed to evaluate Ms. Halmers's credibility properly (*id.* at 17); (3) the ALJ relied upon flawed vocational expert testimony (*id.* at 19); and (4) the Appeals Council failed to consider new evidence properly (*id.* at 21).

### I.   Standard of Review

District courts perform an appellate function when reviewing a final decision of the Commissioner under 42 U.S.C. §§ 405(g). *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981). A reviewing court will uphold an ALJ's decision unless it is based upon legal error or is not supported by substantial evidence. *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998). "'Substantial evidence' is less than a preponderance, but 'more than a mere scintilla' and as much as 'a reasonable mind might accept as adequate to support a conclusion.'" *Crossman v. Astrue*, 783 F.Supp.2d 300, 303 (D. Conn. 2010) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

In determining whether the evidence is substantial, a district court must "take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *see also New York v. Sec'y of Health & Human Servs.*, 903 F.2d 122, 126 (2d Cir. 1990) (stating that the court is required to "review the record as a whole" in assessing whether the evidence supports the Commissioner's position) (citations omitted). Still, the ALJ need not "reconcile every conflicting shred of medical testimony." *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981). In sum, "the role of the district court is quite limited and substantial deference is to be afforded the Commissioner's decision." *Morris v. Barnhardt*, 02 Civ. 0377(AJP), 2002 U.S. Dist. LEXIS 13681, at *12 (S.D.N.Y. July 26, 2002).

Courts cannot supply a new or different rationale for an administrative agency's decision. *S.E.C. v. Chenery Corp.*, 318 U.S. 80, 94-95 (1943). This does not, however, bar a court from

citing additional evidence in the record in support of an existing rationale.  Indeed, "we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974); *see also Sierra Club v. U.S. Army Corps of Eng'rs*, 772 F.2d 1043, 1051 (2d Cir. 1985).

## II.     Discussion of Ms. Halmers's Arguments

### 1.     Substantial evidence supported the ALJ's decision that Dr. Gianinni should not be accorded controlling weight under the "treating physician rule"

Ms. Halmers relies primarily on the recommendations of Dr. Kristin Gianinni, a family medicine doctor with Healthwise Medical Associates' Rockville Family Physicians.  (*See* Pl. Mem. at 2-6, 12-16.)  In a report dated November 7, 2009, Dr. Gianinni diagnosed Ms. Halmers with anxiety and depression.  (R. at 257.)  The report also indicated that Ms. Halmers had a somewhat impaired cognitive status and serious problems with focusing long enough to finish assigned simple activities or tasks, performing basic work activities at a reasonable pace, and performing work activity on a sustained basis.  (R. at 257, 259.)  No other serious problems were indicated, though Ms. Halmers reportedly had some obvious problems with coping and handling frustration, carrying out multi-step instructions, and changing from one simple task to another. (R. at 258-59.)  For the most part, Ms. Halmers faced only slight problems with social interactions.  (R. 259.)  In a letter dated March 18, 2010, Dr. Gianinni wrote that Ms. Halmers's "depression and anxiety has prevented her from even seeking a job, let alone working."  (R. at 286.)

While the ultimate determination of whether a claimant is disabled is reserved to the Social Security Commissioner, 20 C.F.R. § 416.927(d), courts generally give treating physicians' opinions controlling weight as long as they are well-supported by medically acceptable clinical and laboratory diagnostic techniques.  *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008).

However, "the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence . . . ." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (internal citation omitted); *see also* 20 C.F.R. § 416.927(e)(2). An ALJ must consider the following factors – in addition to any other relevant considerations – when refusing to accord controlling weight to a treating physician's medical opinion:

> (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

*Halloran*, 362 F.3d at 32. Among other things, the ALJ examines whether the treating physician's opinion is consistent with the opinions of other medical experts, and with the treating physician's other opinions in the record. *Micheli v. Astrue*, 501 F. App'x 26, 28 (2d Cir. 2012) ("A physician's opinions are given less weight when his opinions are internally inconsistent."); *see also Michels v. Astrue*, 297 Fed. Appx. 74, 75 (2d Cir. 2008). The ALJ must provide good reasons for choosing not to accord the treating physician's opinion controlling weight; failure to do so is cause for remand. *See Burgess*, 537 F.3d at 129-30.

The ALJ gave three reasons for refusing to give controlling weight to Dr. Gianinni's opinion: (1) Dr. Gianinni's letters and reports were inconsistent with each other; (2) the record did not support Ms. Halmers's inability to work, given that she had been employed from 2003-2008 and that her condition was essentially the same during that period as during the period of alleged disability; and (3) Dr. Gianinni had not found it necessary to refer Ms. Halmers to a mental health professional. (*See* R. at 27.)

> *i.   Dr. Gianinni's documents were internally inconsistent*

The internal inconsistencies found within Dr. Gianinni's medical records, letters, and reports provide an adequate basis for declining to give her opinion controlling weight.  While Dr. Gianinni wrote on March 18, 2010 that Ms. Halmers could not work (R. at 286), the doctor also filled out an impairment questionnaire on July 30, 2010 that said that Ms. Halmers "can do some work" and is capable of tolerating low work stress (R. at 359, 361).  In the questionnaire, Dr. Gianinni elected *not* to designate Ms. Halmers as being entirely incapable of handling low work stress.  (R. at 359.)  On January 29, 2011, Dr. Gianinni filled out another impairment questionnaire, again concluding that Ms. Halmers is capable of tolerating low work stress and explaining that "[i]f she is in an environment where she is comfortable she could handle low stress."  (R. at 399-400.)

Dr. Gianinni's medical reports are also inconsistent in describing the severity of Ms. Halmers's conditions.  On April 17, 2011, Dr. Gianinni wrote a letter about Ms. Halmers, stating that "[d]espite her medications *these fears have not been able to be calmed and they have been present for the entire time I have known her* and I would not anticipate that they would resolve."  (R. at 401 (emphasis added).)  This report contradicts somewhat a July 30, 2009 physical exam, at which Ms. Halmers told Dr. Gianinni that she "feels 'great' on the Abilifiy," and about which Dr. Gianinni wrote: "She feels like she is much better with the depression, does not feel as much 'dread.'  Handling situations much better.  Less irritable.  She is more herself on the med."  (R. at 296-97.)  Dr. Gianinni's November 7, 2009 report stated that Ms. Halmers's condition had significantly improved since treatment began.  (R. at 257.)  This sentiment was reflected again in Dr. Gianinni's November 30, 2009 (R. at 290) and March 2, 2010 (R. at 288) exam notes, which stated that Ms. Halmers was "feeling well."  In fact, some medical records make no mention

8

whatsoever of a current diagnosis of anxiety or depression.  (*See* R. at 315 (July 15, 2008 exam, conducted shortly after Ms. Halmers's claim of disability beginning on May 1, 2008 (R. at 130), which only listed depression and anxiety under "past medical"), 312 (same for a December 8, 2008 exam).)

An August 26, 2009 exam (R. at 294) and March 26, 2010 exam (R. at 284) revealed that Ms. Halmers's behavior was: "Attentive and not agitated.  The patient's mood and affect are described as – not anxious, not depressed and not sad."  Similarly, while Dr. Gianinni had reported in November 2009 that Ms. Halmers's cognitive status was "somewhat impaired" (R. at 257), Dr. Gianinni reported in the August 26, 2009 (R. at 294) and March 26, 2010 (R. at 284) exams that her thought processes and cognitive function were "normal," and that her "insight" was "appropriate concerning matters relevant to self."

Dr. Gianinni's assessment that Ms. Halmers is too disabled to work is also inconsistent with Ms. Halmers's actual work record.  If, as Dr. Gianinni reports, it is true that Ms. Halmers has suffered from the same "symptoms and limitations" since "at least 2003 if not earlier" (R. at 400), then Ms. Halmers's employment from 2003 to 2008 (R. at 191)[7] belies the notion that her limitations rise to the level of being a disability as defined in the SSA.  Ms. Halmers's earnings in 2005 and 2006 were even at the substantial gainful activity level.  (*See* R. at 27, 136, 20 C.F.R. § 416.974.)

        ii.    *Dr. Gianinni's opinions were inconsistent with those of other medical experts*

Dr. Gianinni's conclusions also differ from those offered by State agency medical and psychological consultants.  The ALJ is required to consider such opinions because they are

---

[7] While Ms. Halmers's work history stated that she was unemployed for some period of time between 2003 and 2005 (R. at 191), she reported earnings for 2003, 2004, and 2005 (*see* R. at 136, 156).

9

"highly qualified physicians [and] psychologists . . . who are also experts in Social Security disability evaluation." 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i). "[T]he opinions of nonexamining sources [may] override treating sources' opinions provided they are supported by evidence in the record." *Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995. The ALJ noted that she had considered the "entire record" (R. at 25) and provided specific references to the reports of examining psychology doctorate Dr. Douglas Williams (*see* R. at 26) and non-examining psychiatrist Dr. John Ruggiano (*see* R. at 27-28).

In contrast to Dr. Gianinni's November 2009 opinion that Ms. Halmers suffered from a somewhat impaired cognitive status (R. at 257, 260), Dr. Williams reported that she "showed general cognitive abilities within the average range in most areas" and "good problem solving and safety awareness" (R. at 264-65). While Dr. Gianinni rated Ms. Halmers as moderately limited and markedly limited in RFC factors for sustained concentration and persistence (R. at 396-97), Dr. Williams determined that "Ms. Halmers presents no apparent difficulties with understanding and memory. She demonstrates adequate sustained concentration and persistence" (R. at 265). Another examining medical professional, Dr. Jane Walker, stated that during her physical examination Ms. Halmers "was alert and oriented in no acute distress." (R. at 269.)

Dr. Ruggiano, who, admittedly, did not examine Ms. Halmers, found that she had no limitations whatsoever in any of the RFC factors he evaluated (R. at 363) and that Ms. Halmers "is now as she was when she worked" (R. at 368).[8] Other non-examining medical professionals also offered opinions that contradicted Dr. Gianinni. (*See* R. at 277 (Dr. Stephen F Heller concluded that the medical evidence of record ("MER") "reveals no severe impairment"), 278-80

---

[8] The ALJ credited Dr. Ruggiano's opinion, but decided to give Ms. Halmers "the benefit of the doubt" in holding that Ms. Halmers suffered from a severe mental impairment. (R. at 28.)

(psychology doctorate Dr. Mark Berkowitz concluded that Ms. Halmers was capable of "a range of simples tasks with minimal public and coworker contact" and did not conclude that she was entirely incapable of working), 350 (Dr. Susan Uber concluded that Ms. Halmers "would do best in a quiet environment with a solitary job which does not require much interaction with coworkers.").)

Ms. Halmers argues that the ALJ did not cite much of the evidence summarized above, and that the Government's reliance on medical opinions not cited by the ALJ is an improper post-hoc rationalization of agency action.  (*See* Pl. Reply Mem. at 2-3.)  "An ALJ does not have to state on the record every reason justifying a decision.  Although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted.  An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (citations and internal quotation marks omitted).  Because the additional evidence cited above provides *further* support for the ALJ's conclusion that Dr. Gianinni's opinion was inconsistent with other evidence in the record, it does not violate the rule of *Chenery* to rely on it.  "Under the circumstances here presented the *Chenery* decision does not compel a reviewing court to direct a remand which would almost certainly be an exercise in futility." *Phillips v. S.E.C.*, 388 F.2d 964, 971 (2d Cir. 1968).

Because the record contained substantial evidence that was not consistent with Dr. Gianinni's opinions, the ALJ did not err in refusing to accord controlling weight to Ms. Halmers's treating physician.

### 2. *Substantial evidence supported the ALJ's assessment that Ms. Halmers was partially credible*

It is the province of the Commissioner, not the reviewing court, to determine the credibility of a claimant.  *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir.

1983). "[T]he ALJ is required to take the claimant's reports of pain and other limitations into account, but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (internal citations omitted). The ALJ uses the following framework to assess a claimant's credibility:

> [T]he adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record. An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.

SSR 96-7p. When additional information is needed to determine credibility, the adjudicator must consider additional factors, such as the claimant's daily activities, medications, and factors that aggravate the symptoms. *Id*.

In accordance with 20 C.F.R. § 404.1529 and SSRs 96-4p and 96-7p, the ALJ stated that she "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence . . . ." as well as the "opinion evidence" required under 20 C.F.R. § 404.1527 and SSRs 96-2p, 96-5p, and 06-3p. (R. at 25.) The ALJ then concluded that Ms. Halmers's "testimony relative to the existence of her medically determinably [sic], and severe, impairments, as well as the symptoms resulting from the same" and "testimony relative to the duration, intensity, and limiting effects of these impairments" was not fully credible. (R. at 26.)

Ms. Halmers argues that (1) the ALJ's credibility determination was vague boilerplate language that was unsupported by specific reasons, and (2) the ALJ did not give adequate consideration to her testimony, which was consistent with the underlying medical records. (Pl.

Mem. at 17-19.)  The claim that the ALJ did not cite enough specific reasons for her credibility determination is moot because "implicit credibility resolutions are appropriate where an ALJ's treatment of the evidence is supported by the record as a whole."  *Francis v. Astrue*, No. 09-cv-01826, 2011 WL 344087, at *4 (D. Conn. Feb. 1, 2011) (quoting *N.L.R.B. v. Katz's Delicatessan of Houston St., Inc*, 80 F.3d 755, 765 (2d Cir. 1996).  As evidenced by the ALJ's discussion and ultimate disposition of Ms. Halmers's claim, it is clear that any explicit credibility resolutions the ALJ failed to make were made implicitly.  Even case law from the Seventh Circuit, which Ms. Halmers cites, has determined that the use of boilerplate language is not an error, holding that "[i]f the ALJ has otherwise explained his conclusion adequately, the inclusion of this language can be harmless."  *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012).  The boilerplate language employed by the ALJ was supported by specific recitations of Ms. Halmers's treatments and daily activities, such as driving to her barn and caring for her horse (R. at 25-26), which are factors used to consider a claimant's credibility.  For example, the ALJ found that Ms. Halmers "is actually happy when she is with her horse that she visits and cares for every day, showing that she has the ability and desire to accomplish tasks."  (R. at 28.)

Further, and contrary to her claims on appeal, Ms. Halmers's testimony was inconsistent with the underlying medical records.  Ms. Halmers testified about having sore hips, particularly while walking up and down stairs (R. at 45), but told Dr. Williams that she had "no significant problems with walking, going up and down stairs, lifting and bending, and fine motor skills" (R. at 263).  Ms. Halmers also testified about her fear of going out in public and being around other people.  (*See* R. at 44, 45 ("I just can't go – I try to but I can't go into strange places. Being around the public, it just – I can't – I can't do it."), 261 (As written by Dr. Williams: "My anxiety disorder limits my ability to function in crowded or busy areas.  My heart starts racing,

sweating, dizziness, difficulty focusing, and shortness of breath.").) As reported on March 17, 2011, by Mr. Mark Napiello, a licensed marriage and family therapist, however, Ms. Halmers apparently chose to go to New York City. (R. at 408 ("NY Trip – 'did good' – Central Park.").) Ms. Halmers explained to the ALJ that she struggles to read and often reads the same page over and over again (R. at 59), but conversely explained to Dr. Williams has "no difficulty with reading and writing skills" (R. at 263).

Ms. Halmers also told the ALJ that she used to do household chores, such as shopping and laundry, but stopped when she became sad a number of years ago. (*See* R. at 49.) In her activities of daily living questionnaire, however, Ms. Halmers stated that she was able to do laundry and cleaning and shop in stores. (R. at 185-86.) While she did not prepare meals, the reason she gave was that she hated and dreaded cooking. (R. at 184.) Similarly, as the ALJ noted (R. at 28), in her meeting with Dr. Walker, Ms. Halmers did not give sadness or depression as the reason for not doing household chores, instead explaining that she "can do household tasks like dishes, laundry and vacuuming, but dislikes doing them and would rather just lie on the couch" (R. at 268).

Substantial evidence exists in the form of Ms. Halmers's testimony, actions, and objective medical records to support the ALJ's conclusion that Ms. Halmers was only partially credible.

### 3. *The ALJ did not rely upon flawed vocational expert testimony*[9]

    i.   *The vocational expert used a proper RFC finding in his evaluation*

---

[9] While the claimant bears the burden of proving the first four steps in the five-step evaluation process (*see* note 3, *supra*), the Commissioner must prove the final one. *Berry*, 675 F.2d at 467. Thus, if the claimant is successful in showing that he is unable to continue his past relevant work, "the [Commissioner] then has the burden of proving that the claimant still retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy." *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir.1986).

Ms. Halmers argues that the ALJ relied on vocational expert testimony that was "flawed" because it depended on an erroneous RFC finding. (Pl. Mem. at 19-20.) She links this argument directly to her argument about the treating physician rule. (*Id*. at 20.) As the Court has rejected the latter argument, and found that there is substantial evidence to support the ALJ's finding that Ms. Halmers was only partially credible, Ms. Halmers's argument on this point is meritless.

Furthermore, the ALJ's RFC assessment, in large part, matches Dr. Gianinni's assessment. Ms. Halmers makes no claim on appeal that she has any physical limitations that should have affected the ALJ's RFC assessment with respect to exertional limitations. Dr. Gianinni reported that Ms. Halmers was limited in her ability to work only due to anxiety and depression, with no mention of any physical limitations. (R. at 257, 286, 395, 401.) The ALJ found that Ms. Halmers suffered from medically documented, yet non-severe, impairments of diabetes, headaches, and obesity and a medically unsubstantiated claim of hip pain. (R. at 22-23.) Dr. Gianinni's records are consistent with this conclusion. (*See*, *e.g.*, R. at 251 (July 15, 2008 lab of HMA Hemoglobin A1C, which resulted in a diagnosis of "diabetes mellitus without mention of complication; type II, not stated as uncontrolled"); *compare* R. at 311 (December 8, 2008 exam documenting hip pain) with R. at 283, 290, 293, 297, 302, 306 (later-dated exams where no muscle pain or issues with the musculoskeletal system were reported).) Dr. Gianinni never made any reference to Ms. Halmers's obesity and a November 10, 2008 lab report that she reviewed shows that Ms. Halmers's cholesterol and triglyceride levels were within the normal range. (*See* R. at 249.) Similarly, Dr. Gianinni made only one reference to a headache, which was listed along with complaints about head and chest congestion, a deep barking cough, and sinus problems; Dr. Gianinni concluded: "The patient . . . presents with cold symptoms." (R. at 302.) Furthermore, tests ordered by Dr. David Wolpaw, on June 23, 2006 showed no

neurological issues after her complaints about headaches. (*See* R. at 233 ("The ventricles, cisterns, and sulci are normal in size."), 234 ("MRA of the brain was performed . . . . There is no occlusion or stenosis. There is no aneurysm or vascular malformation. . . . Impression: Normal.").) The record shows that Dr. Gianinni focused primarily and consistently on Ms. Halmers's diagnosis of anxiety and depression (*see*, *e.g.*, R. at 284, 288, 291, 294, 298, 300 (section labeled "Assessments & Plans")), which the ALJ accepted when she found that Ms. Halmers's anxiety and depression rose to the level of being severe impairments (R. at 22). Dr. Gianinni's exam notes reflect that Ms. Halmers exercised and exerted herself by caring for her horses. (*See* R. at 299 and 311 ("The patient exercises a [sic] daily."), 305 ("Has been going to the gym every day."), 314 ("The patient exercises a [sic] daily (horseback riding and taking care of them).").)

Dr. Gianinni's opinions also largely support the ALJ's RFC finding with respect to nonexertional limitations. The ALJ found that Ms. Halmers can perform a full range of work with the following nonexertional limitations: "she is limited to simple, routine, repetitive tasks involving short, simple instructions in the environment with few workplace changes, no strict time or production quotes, no public contact, and only brief, infrequent contact with supervisors and co-workers." (R. at 25.) These nonexertional limitations are also supported by Dr. Gianinni's reports. Recall that Dr. Gianinni said that Ms. Halmers was capable of tolerating low work stress. (R. at 399.) The ALJ called for short, simple instructions, which correlates with Dr. Gianinni's assessment that Ms. Halmers is only mildly limited in the ability to carry out simple one or two-step instructions. (*See* R. at 396.) The ALJ called for routine, repetitive tasks, which correlates with Dr. Gianinni's assessment that Ms. Halmers is only mildly limited in the ability to sustain ordinary routine without supervision. (*Id.*) Dr. Gianinni identified Ms. Halmers as

only moderately limited in three of the five factors used to evaluate social interactions, with the ability to accept instructions and respond appropriately to criticism from supervisors as the only factor in which she was markedly limited. (R. at 397.) This assessment dovetails with the ALJ's requirements of no public contact, and only brief, infrequent contact with supervisors and co-workers.

> ii. *Some of the hypothetical questions posed by the ALJ and Ms. Halmers's attorney to the vocational expert do not apply to Ms. Halmers*

Ms. Halmers argues that some of the hypothetical questions posed to the vocational expert during the hearing (R. at 63-64) apply to her and, therefore, that the vocational expert's answers to those questions warrant a different RFC finding. (Pl. Mem. at 20-21.) A review of the ALJ's decision shows that the ALJ, through her RFC assessment, did not find that all of these hypothetical limitations applied to Ms. Halmers. As discussed above, the ALJ considered the entire record in her assessment of Ms. Halmers's RFC and there is substantial evidence to support the ALJ's RFC finding.

Ms. Halmers argues that the vocational expert's testimony that a person who exhibits behavioral extremes on a daily basis would be unable to maintain any job is applicable to her. (Pl. Mem. at 20, citing R. at 64.) There is no evidence in the record, however, that Ms. Halmers exhibited behavioral extremes *on a daily basis*. (*See* R. at 261-63 (Dr. Williams observed that "Ms. Halmers related in a reserved and cautious manner" and "maintained good eye contact."), 397 (Dr. Gianinni assessed Ms. Halmers as only moderately limited in the RFC factor of the "ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes.").)

Ms. Halmers relies on the vocational expert's testimony that a person who is absent from work more than once a month could not work. (Pl. Mem. at 20, citing R. at 64.) Other than Dr.

Gianinni's assessments (R. at 360, 400), there is no evidence in the record to support the application of this limitation to Ms. Halmers.  Ms. Halmers's previous ability to work up to five days per week while suffering from depression and anxiety supports the ALJ's decision not to apply this limitation to her.  (*See* R. at 193, 196).  Similarly, there is nothing in the record, other than Dr. Gianinni's assessment (R. at 397), to demonstrate that the vocational expert's opinion that an individual who cannot handle any criticism would be unable to work applied to Ms. Halmers.  (*See* Pl. Mem. at 20, citing R. at 64-65.)  While Dr. Gianinni offered the opinion that Ms. Halmers is markedly limited in "the ability to accept instructions and respond appropriately to criticism to supervisors" (R. at 397), a marked limitation does not mean that Ms. Halmers would be unable to handle *any* criticism "*at all*" (*see* R. at 64 (emphasis added)).  Indeed, Ms. Halmers, while suffering from anxiety and depression, was able to maintain a full-time job that undoubtedly would have entailed at least occasional criticism.  (*See* R. at 191, 400-01.)

Ms. Halmers also argues that the vocational expert's testimony that a person who cannot focus for two hours would be unable to maintain any job is applicable to her.  (Pl. Mem. at 20, citing R. at 63.)  This is a mischaracterization of the vocational expert's testimony.  The vocational expert testified that someone who took unscheduled breaks, in addition to a fifteen minute break in the morning and afternoon and a thirty minute lunch break, would not be able to maintain a job; he did not opine on sustained focus and concentration, which is different from taking unscheduled breaks.  (R. at 64.)  Furthermore, there is evidence in the record to contradict the assertion that Ms. Halmers cannot focus for extended periods of time.  (R. at 264 (Ms. Halmers "indicate[d] no concerns regarding attention and memory."), 185 (Ms. Halmers wrote in her activities of daily living questionnaire that she could do laundry and cleaning "when it need[s] to be done, all day.").)

18

### *4. The new evidence submitted to the Appeals Council was properly considered*

Last, Ms. Halmers argues that the Psychiatric/Psychological Impairment Questionnaire submitted by Mr. Napiello was not properly considered by the Appeals Council. (Pl. Mem. at 21.) The Appeals Council explained that it had "carefully reviewed" the questionnaire and "found that this information does not provide a basis for changing the [ALJ's] decision." (R. at 2.) Although Ms. Halmers challenges the Appeals Council's "unexplained boilerplate" language (Pl. Mem. at 21), she does not point to any authority requiring the Appeals Council to provide a more detailed explanation of how Mr. Napiello's opinion was considered, nor to any evidence showing that the Appeals Council did not consider the opinion.

It is important to note that Mr. Napiello is a licensed marriage and family therapist, which is not considered an "acceptable medical source" capable of "provid[ing] evidence to establish an impairment." 20 C.F.R. § 404.1513(a). He is classified as an "other source," along with education personnel and family members, who *may* be used to show the severity and limitations of a claimant's impairment. 20 C.F.R. § 404.1513(d). As a result, Mr. Napiello's opinion does not warrant controlling weight and, to the extent it contradicts the views of State agency medical and psychological consultants, it must yield to these acceptable medical sources.

Further, it is difficult to see what additional, material information Mr. Napiello could provide, given that Ms. Halmers testified that she does not feel comfortable talking openly to him. (R. at 53 ("I see a therapist, but I don't talk to [him] about how I feel 'cause I don't know – I always talk to Dr. Gennini [sic] – I'm not comfortable – I talk about my daughters at the therapist – but Dr. Gennini [sic], who knows me, understands me, I talk to her.").) Indeed, a

review of his report does not reveal any new significant information about Ms. Halmers.[10] Both Mr. Napiello and Dr. Gianinni noted that Ms. Halmers had anxiety and depression (R. at 413, 393), social withdrawal or isolation (R. at 414, 394), sleep disturbance (*id.*), mood disturbance (*id.*), feelings of guilt/worthlessness (*id.*), decreased energy (*id.*), and other clinical findings. Mr. Napiello found that Ms. Halmers has had suicidal ideation or attempts (R. at 414), as did Dr. Walker (R. at 267).

### III. Conclusion

For the foregoing reasons, the Court **GRANTS** the Commissioner's Motion for an Order Affirming the Decision of the Commissioner [doc. # 15] and **DENIES** Ms. Halmers's Motion for Judgment on the Pleadings [doc. # 11]. The Clerk is directed to close this case.

IT IS SO ORDERED.

/s/
Michael P. Shea, U.S.D.J.

Dated:   Hartford, Connecticut
         September 26, 2013

---

[10] Even if the Appeals Council had not reviewed Mr. Napiello's findings, remand would not be warranted because his findings are largely duplicative of Dr. Gianinni's opinions. *See Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) (declining to remand to the ALJ for failure to consider a doctor's report because the report was not significantly more favorable to the claimant).